# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

PATRICIA SANTOS SOTO-MARQUEZ,

      Plaintiff,

    v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

      Defendant.

_____/

Case No. 1:17-cv-00826-SKO

ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT

(Doc. 1)

## I.    INTRODUCTION

On June 21, 2017, Plaintiff Patricia Santos Soto-Marquez ("Plaintiff") filed a complaint under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

///

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 7, 8.)

## II.    FACTUAL BACKGROUND

On January 14, 2013, Plaintiff protectively filed an application for DIB payments, alleging she became disabled on August 11, 2012, due to: chronic right knee pain status post-arthroplasty (complete knee replacement); chronic back pain due to herniated lumbar disc without myelopathy; lumbar spondylosis; diabetes; interstitial cystitis with frequent urination and urgency; chronic gastritis and GERD[2] with nausea, vomiting, and chronic diarrhea; asthma; leg edema; high blood pressure; generalized anxiety disorder; major depressive disorder; and post-traumatic stress disorder.  (Administrative Record ("AR") 12, 39, 83–84, 93–94, 176–79, 189, 192, 200, 208.) Plaintiff was born on September 3, 1964, and was 47 years old on the alleged onset date.  (AR 35, 83, 93.)  She has a high school education.  (AR 35–36.)  Plaintiff has past work experience from January 2000 to August 2014 as a home attendant and a janitorial worker.  (AR 24, 227, 234.)  In 2013, Plaintiff earned $11,970.63 from Geil Enterprises and from self-employment.  (AR 14, 182.) Plaintiff earned $2,306.00 in 2014 from Domestic Care Employment Agency.  (AR 14, 186.)

## A.    Relevant Medical Evidence[3]

### 1.    Bautista Medical Group

In August 2012, Plaintiff presented to J. Luis Bautista, M.D., complaining of diarrhea and vomiting.  (AR 266–68.)  She was noted to be well-nourished, in no apparent distress, cooperative, and interactive.  (AR 267.)  Dr. Bautista assessed Plaintiff with GERD, gastritis, and chronic diarrhea, and referred her for colonoscopy.  (AR 267.)  Plaintiff's colonoscopy results were "notable" for gastritis and diverticulosis.  (AR 269.)

On September 4, 2012, Plaintiff was seen by Ignacio Guzman, M.D., who assessed Plaintiff with essential hypertension, generalized anxiety disorder, GERD, and helicobacter pylori.  (AR 269–270.)  Dr. Guzman prescribed medication for Plaintiff's high blood pressure and GERD.  (AR 270.)  Plaintiff complained of uncontrolled hypertension, anxiety, and hemorrhoids on September 21, 2012.  (AR 273.)  Dr. Bautista assessed Plaintiff with anxiety, hemorrhoids, and hypertension,

---

[2] GERD is an acronym for gastroesophageal reflux disease.  *See Dorland's Illustrated Medical Dictionary* 783 (31st ed. 2007) [hereinafter *Dorland's*].
[3] As Plaintiff's assertions of error is limited to the ALJ's assessment of (1) the medical opinion evidence with respect to Plaintiff's physical impairments and (2) Plaintiff's subjective complaints of pain (*see* Doc. 13 at 19–25; Doc.15 at 2–5), only evidence relevant to those arguments is set forth below.

and initiated a medication regime.  (AR 274.)  In November 2012, Plaintiff continued to complain of hemorrhoids and was prescribed pain medication and a rectal cream.  (AR 277–78.)

On January 16, 2013, Plaintiff presented to Dr. Bautista complaining of abdominal pain, nausea, and right knee pain.  (AR 279.)  On examination, Dr. Bautista noted Plaintiff was positive for epigastric pain.  (AR 280.)  Plaintiff was assessed with hypertension, anxiety, and epigastric pain.  (AR 280.)  Plaintiff continued to complain of abdominal pain on January 30, 2013, and was referred to a gastroenterologist.  (AR 303–04.)  Her hypertension was noted to be controlled.  (AR 304.)  In March 2013, Plaintiff complained of leg pain.  (AR 300.)  Her examination showed no evidence of joint pain or tenderness, and she had full range of motion intact to all major joints.  (AR 302.)  Plaintiff's diabetic foot exam showed intact sensation bilaterally on the first and fourth digit of the plantar surface and three points bilaterally on the metatarsal surface.  (AR 302.)

Plaintiff complained on May 13, 2013, that her right knee locks, gives out when walking, and is swollen and painful.  (AR 297.)  Dr. Bautista noted Plaintiff's knee had joint line tenderness and the presence of bunions on both feet.  (AR 297.)  He diagnosed her with a meniscus tear, knee pain, leg edema, and varicose veins.  (AR 297–98.)  Plaintiff was referred for an MRI for her right knee and to podiatry for her bunions and was prescribed medication for pain.  (AR 298.)

An MRI, performed May 14, 2013, showed "[g]rade II signal on the body and posterior horn of medial meniscus," "[m]yxoid degeneration of both horns of lateral meniscus and anterior horn of medial meniscus," "[g]rade I injury of medical collateral ligament," "[s]prain of anterior cruciate ligament," "[m]inimal synovial effusion," "[m]ild changes of osteoarthritis in the right knee joint," and "[m]ild subcutaneous edema around the knee joint."  (AR 294–95.)  On May 17, 2013, Dr. Guzman diagnosed Plaintiff with a tear of the medial cartilage or meniscus in her knee, based on the MRI results.  (AR 292.)  He administered an injection in Plaintiff's right knee.  (AR 293.)

Plaintiff attended a follow-up appointment on May 28, 2013, where she was noted to be "very upset throughout" the visit.  (AR 288.)  Plaintiff stated that she "has worked all her life and deserves dissability [sic]."  (AR 288.)  On examination, Plaintiff had joint line tenderness in her right knee.  (AR 288.)  Dr. Bautista noted a tear of meniscus cartilage or meniscus of Plaintiff's knee and referred her to orthopedic specialist.  (AR 288.)

### 2. Apna Urgent Care

In July 2013, Plaintiff presented to urgent care complaining of chest tightness, difficulty breathing, and headaches for four days. (AR 412–13.) She was treated with medication, including an inhaler. (AR 413.) In January 2014, she denied vomiting or diarrhea. (AR 407.) Plaintiff presented in August 2014 for complaints of nausea, vomiting, diarrhea, and lower back pain. (AR 398–99.) On examination, epigastric tenderness was noted. (AR 399.) Plaintiff was prescribed medication. (AR 399.)

### 3. D. Kevin Lester, M.D.

Plaintiff was evaluated by Dr. Lester, an orthopedic surgeon, on August 7, 2013. (AR 342.) Dr. Lester noted that Plaintiff's examination of her knee and x-ray were both normal, but that it was "clear she has a meniscus tear." (AR 342.) He recommended an arthroscopic medial meniscectomy. (AR 342.) The surgery was performed on August 21, 2013. (AR 336–37.)

On September 4, 2013, Plaintiff was seen by Dr. Lester for a follow-up appointment after surgery. (AR 334.) She stated she was "doing well." (AR 334.) Dr. Lester noted full and unimpeded range of motion in Plaintiff's right knee with a "little mild pain" on the end range of flexion/extension, which he attributed to Plaintiff "only being two and one-half weeks out postop." (AR 334.) Dr. Lester concluded that Plaintiff was "doing very well" and "has no complaints at this time." (AR 334.) She was released to return to work on September 30, 2013. (AR 333.)

Dr. Lester noted on September 18, 2013, that Plaintiff was experiencing some pain in her knee but "it is not very bad four weeks postop." (AR 331.) Plaintiff received a corticosteroid injection and was recommended to return in two weeks. (AR 331.) In November 2013, Plaintiff complained of "mild pain" and requested an injection. (AR 330.) "Some arthritis" in Plaintiff's knee was noted. On examination, Plaintiff had some mild tenderness to palpation at the medial joint line in her right knee. (AR 330.) Her range of motion was full and unimpeded bilaterally. (AR 330.) Another corticosteroid injection was administered to Plaintiff's right knee. (AR 330.)

In December 2013, Plaintiff stated that she had "some mild pain" but was "doing much better" and requested an injection. (AR 329.) Mild tenderness to palpation of Plaintiff's right knee over the medial joint line was noted, but her range of motion was full and unimpeded bilaterally.

(AR 329.) Plaintiff continued to be "doing well" after her arthroscopy and her right knee pain was deemed to be "secondary to degenerative joint disease." (AR 329.) Plaintiff received another injection. (AR 329.)

Plaintiff presented at an appointment to start a weekly hyaluronic acid injection regimen on January 13, 2014. (AR 328.) She complained of "some pain with weight bearing," and was noted to have "some arthritis" in her right knee. (AR 328.) Plaintiff was noted to have right knee osteoarthritis. (AR 328.)

On January 12, 2015, Plaintiff underwent another MRI of her right knee. (AR 363–64.) The MRI showed "extensive full thickness cartilage loss in the medial knee compartment" with "underlying reactive marrow edema." (AR 364.) The MRI also suggested a "retear of the medial meniscal body." (AR 364.) Dr. Lester evaluated Plaintiff on January 19, 2015, and noted that she has had "progressive arthritis" in her right knee as a well as a new medial meniscus tear. (AR 369.) In consultation with Dr. Lester regarding treatment options, Plaintiff chose to undergo another arthroscopic surgical procedure, which would "only remove the torn cartilage" and "would not remove the advanced arthritis." (AR 369.) Dr. Lester's treatment note on March 3, 2015, indicated that Plaintiff had "significant arthritis of her knee" and had "exhausted non-operative treatment." (AR 361.) The note states that he "discussed with [Plaintiff] the risks, benefits, and alternatives of surgery including clots, pain, infection, and failure as well as the fact that 20% of all people are unsatisfied with the surgical result." (AR 361.) Plaintiff opted to "proceed with surgery nonetheless." (AR 361.)

On March 4, 2015, Dr. Lester completed a "Scored Knee Assessment," in which he found that Plaintiff's knee had marked pain when resting and bearing weight. (AR 362.) He opined that Plaintiff had a moderate limp and needed bilateral support when climbing stairs, but did not need an assistive device for support. (AR 362.) Dr. Lester found Plaintiff could walk only two to five blocks and her range of motion was 90 to 109 degrees. (AR 362.) Her quad strength was normal. (AR 362.)

Plaintiff underwent a total right knee arthroplasty on March 9, 2015. (AR 359–60.) On March 23, 2015, Plaintiff reported "feeling good" with "some soreness" but "no complaints." (AR

358.)  Plaintiff's range of motion of her knee was 0 degrees to 90 degrees.  (AR 358.)  She was deemed to be "doing well" and was to continue physical therapy.  (AR 358.)  Plaintiff's discharge instructions from Saint Agnes Home Health dated March 26, 2015, were to "continue exercises twice a day" and to "walk outdoors with a cane twice a day," with gradual increases in distance every week.  (AR 467.)  Plaintiff was advised to avoid increased knee pain or fatigue.  (AR 467.)

Dr. Lester saw Plaintiff on May 12, 2015, and reported she "could not be doing better" and that her range of motion was "excellent."  (AR 357.)  Dr. Lester noted Plaintiff is "limping a bit" and that she is using a cane but does not need it.  (AR 357.)  Dr. Lester concluded that Plaintiff is "very happy with the results and the resolution of her pain."  (AR 357.)  In June 2015, Dr. Lester noted that Plaintiff is still walking with a cane for long walks but "is otherwise doing fine."  (AR 356.)  He reported that Plaintiff was "very happy that she has no pain."  (AR 356.)

On August 10, 2015, Plaintiff presented to Dr. Lester for an evaluation five months after her surgery.  (AR 355.)  She reported that she was still having pain and using narcotics.  (AR 355.)  Dr. Lester found Plaintiff's scar "a bit erythematous suggesting internal inflammation as well as external."  (AR 355.)  He observed: "One out of five knees is like this.  It is not the fault of the patient or anyone else."  (AR 355.)  Plaintiff's x-ray examination was normal.  (AR 355.)  Dr. Lester also noted Plaintiff complained of right sacroiliac pain, which could be helped by an injection.  (AR 355.)

**4.  Consultative Examiner Mickey Sachdeva, M.D.**

On January 7, 2014, Plaintiff underwent an internal medicine evaluation by Dr. Sachdeva at the request of the Department of Social Services, who, in addition to performing a physical examination, reviewed Plaintiff's May 2013 right knee MRI results (pre-surgery).  (AR 316–21.)  Plaintiff was noted as being a well-developed, well-nourished, healthy-appearing female in no distress.  (AR 318.)  The range of motion in her neck was within normal limits.  (AR 318.)  Dr. Sachdeva found no tenderness to palpation in the midline or paraspinal areas of Plaintiff's back and her range of motion was normal.  (AR 319.)  Plaintiff's ranges of motion in her upper extremities (*i.e.*, shoulders, elbows, and wrists) were within normal limits.  (AR 319.)  Her straight leg raising tests in seated and supine positions were negative bilaterally.  (AR 319.)  The range of motion in

Plaintiff's knees at flexion was limited to 100 degrees; otherwise, the ranges of motion in her lower extremities were also within normal limits. (AR 320.) Dr. Sachdeva found that Plaintiff had good tone bilaterally and good active motion, with "5/5" motor strength in all extremities. (AR 320.) Plaintiff's gait was within normal limits. (AR 320.)

Dr. Sachdeva diagnosed Plaintiff with "[r]ight knee pain secondary to MCL and ACL sprain, status post surgical intervention in August 2013, now stable," and noted "[p]ain currently consistent with osteoarthritis of the right knee." (AR 320.) He also assessed diabetes, hypertension, urinary incontinence, and GERD. (AR 320.) Dr. Sachdeva opined that Plaintiff should be able to stand and/or walk for four hours in an eight-hour work day, sit for six hours in an eight-hour work day, lift and carry 20 pounds occasionally and 10 pounds frequently, and perform occasional postural activities. (AR 321.) Plaintiff did not need an assistive device for ambulation and had no manipulative or workplace environmental limitations. (AR 321.)

### 5. Consultative Examiner Ekram Michiel, M.D.

On January 24, 2014, psychiatrist Dr. Michiel performed a comprehensive psychiatric examination of Plaintiff. (AR 346–49.) Plaintiff was observed to be fairly groomed, casually dressed, and with adequate personal hygiene. (AR 347.) She reported being able to take care of her personal hygiene tasks, shop, cook, and do household chores. (AR 347.) Dr. Michiel noted Plaintiff's mood was "depressed," with a tearful and anxious affect. (AR 347.) Her speech was "interrupted by open crying." (AR 347.) Plaintiff's thought process was goal-directed and her thought content was not delusional. (AR 348.) Dr. Michiel noted that Plaintiff's remote memory showed impairment, as she could not recall the birthdays of her two children. (AR 348.)

Dr. Michiel diagnosed Plaintiff with anxiety disorder NOS [not otherwise specified], depressive disorder NOS, and possible comorbid illness of post-traumatic stress disorder (domestic abuse). (AR 348.) With respect to Plaintiff's mental residual functional capacity ("RFC")[4], Dr.

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

Michiel opined that while Plaintiff can maintain attention and concentration to carry out simple job instructions, she is unable to carry out an extensive variety of technical and/or complex instructions. (AR 349.) Dr. Michiel opined further that Plaintiff "would have difficulty relating to coworkers, supervisors, and the general public in a work setting due to her anxiety that is part of her mental illness as a result of surviving physical abuse for many years." (AR 349.) He found no restrictions on Plaintiff's activities of daily living or her ability to handle her own funds. (AR 349.)

### 6. State Agency Physicians

On May 15, 2013, George N. Lockie, M.D., a Disability Determinations Service medical consultant, reviewed Plaintiff's records and concluded that her physical impairments of "[e]ssential [h]ypertension" and "[g]astritis and [d]uodenitis" were non-severe. (AR 87–88.) Upon reconsideration on February 18, 2014, another Disability Determinations Service medical consultant, J. Mitchell, M.D., deemed Plaintiff's knee pain "severe" and assessed Plaintiff's physical RFC. (AR 100–104.) Dr. Mitchell opined Plaintiff could occasionally lift and/or carry 50 pounds and frequently 25 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; perform unlimited push/pull activities with both extremities; climb occasionally; and kneel, crouch, and crawl frequently. (AR 103–04.) According to Dr. Mitchell, Plaintiff had no other limitations. (AR 104.)

### 7. Pawan K. Sood, M.D.

Plaintiff established care with Dr. Sood of Chestnut Medical Group of Fresno in November 2014. (AR 377, 379.) On November 25, 2014, Plaintiff presented to Dr. Sood complaining of "[f]ullness in stomach" and some constipation. (AR 376.)

Plaintiff presented on July 3, 2015 complaining of high blood pressure, loose stool, and worsening stomach pain over a two-week period. (AR 373.) Dr. Sood noted Plaintiff's hypertension was "uncontrolled" and prescribed an additional blood pressure medication. (AR 373.) Dr. Sood's treatment note from July 29, 2015, reports Plaintiff had been in the emergency room overnight for high blood pressure and that she had been experiencing frequent urination for two days. (AR 372.) In August 2015, Plaintiff continued to complain of a "bloating sensation." (AR 371.)

On October 13, 2015, Dr. Sood certified to the California Department of Motor Vehicles

that Plaintiff required a temporary disability placard until April 10, 2016, because she suffered from a "severe disability in which . . . she is unable to move without the aid of an assistive device" due to her total right knee replacement. (AR 416.)

### 8. Dueker Fee Physical Therapy

On April 23, 2015, Plaintiff had her initial physical therapy evaluation. (AR 461–63.) The physical therapist noted Plaintiff used a cane to walk and had an antalgic gait. (AR 461.) Plaintiff reported pain with walking, standing, sitting, getting in/out of a car, and with the use of steps. (AR 461.) The physical therapist noted "[m]oderate edema" of Plaintiff's right knee, tenderness at the medial right knee, and warmth at her lateral scar. (AR 461.) Plaintiff was recommended to attend seven physical therapy sessions. (AR 463.)

On discharge in May 2015 following her seven sessions, Plaintiff had mild tenderness at the medial knee joint, moderate edema, and no longer used an assistive device. (AR 458.) The physical therapist observed Plaintiff "has progressed well in therapy with decreased pain and increased [range of motion] and strength." (AR 459.) The physical therapist noted further Plaintiff "still lacks full extension and flexion of her knee, but feels she can do her home exercise program to progress to full [range of motion]." (AR 459.)

### 9. LAGS Spine & Sportscare

Plaintiff presented to LAGS Spine & Sportscare on April 30, 2015, complaining of pain in her neck, lower back, and knee. (AR 447–50.) Plaintiff indicated her pain was aggravated by sitting, rising from sitting, standing, leaning forward, walking, and lying on her stomach. (AR 447.) She reported her sleep was disturbed (AR 447), although elsewhere in the note Plaintiff denied sleep disturbance (AR 448). Plaintiff indicated she experienced fatigue, abdominal pain, constipation, nausea, leg cramps, and muscle aches. (AR 449.) On examination, she was observed to walk with a walker, have an "abnormal gait," and be unable to walk on her heels and toes. (AR 449.) Plaintiff had pain with range of motion testing, "appreciable joint effusion," and "palpable tenderness" at the medial and lateral joint lines. (AR 449.) She was prescribed ibuprofen and Vicodin for pain. (AR 449.)

On August 11, 2015, Plaintiff complained of right knee and lower back pain. (AR 433.)

Plaintiff also noted having abdominal pain and constipation, but denied vomiting and diarrhea. (AR 434.) On examination, Plaintiff was noted as having an antalgic gait and that she had a cane at home. (AR 434.) Her right knee had "appreciable effusion" and pain with range of motion testing. (AR 434.) There was palpable tenderness at the lateral and medial joint lines. (AR 434.) A bone scan and an MRI of Plaintiff's lumbar spine were ordered, along with a right knee brace. (AR 434.) She received a Vicodin prescription refill. (AR 434.)

Plaintiff presented for neck, shoulder, back, and leg pain on September 3, 2015. (AR 430–32.) Her gait was noted as "abnormal," but she was able to walk on her heels and toes. (AR 431.) Plaintiff's right knee was noted to have "appreciable effusion" and pain with range of motion testing. (AR 431.) No palpable tenderness was noted. (AR 431.) With respect to Plaintiff's lumbar spine, her Patrick test[5] was positive on the right side, with all other testing negative. (AR 431.) Plaintiff was assessed with a history of total knee replacement, chronic knee pain, and sacroiliac dysfunction. (AR 431.) She was provided with pain medication refills and advised to continue use of the knee brace. (AR 431.) A right sacroiliac injection was ordered. (AR 431–32.)

On October 9, 2015, Plaintiff presented for a follow-up appointment complaining of right knee pain. (AR 427–29.) On examination, Plaintiff was noted to have "appreciable effusion" in her right knee and pain with range of motion testing, but no palpable tenderness. (AR 428.) She had a positive Patrick test on the right side and was assessed with sacroiliac dysfunction. (AR 428.) Plaintiff's pain medications were refilled. (AR 428.)

An MRI of Plaintiff's lumbar spine was performed on October 28, 2015. (AR 418.) The MRI showed "[m]inor degenerative changes of the lumbar spine with neural foraminal narrowing at several levels and nerve abutments at L5-S1" and "[m]ild disc bulges at T11-12, L4-5 and L5-S1 slightly indenting on the thecal sac without significant central canal stenosis. (AR 419.)

Plaintiff presented on November 5, 2015, complaining of lower back and right knee pain. (AR 424.) She denied vomiting and diarrhea. (AR 425.) Her gait was noted as "abnormal," but she was able to walk on her heels and toes. (AR 425.) Plaintiff's right knee was noted to have "appreciable effusion" and pain with range of motion testing. (AR 425.) No palpable tenderness

---

[5] A Patrick test is performed to determine the presence of arthritis in the hip. *See Dorland's* at 1920.

was noted. (AR 425.) Plaintiff's Patrick test was positive on the right side, with all other testing negative. (AR 425.) In addition to a history of total knee replacement, chronic pain of the right knee, and sacroiliac dysfunction, Plaintiff was assessed with neuropathic pain of both feet, herniated lumbar disc without myelopathy, lumbar spondylosis, and diabetes. (AR 422, 425.) An electromyogram study of Plaintiff's bilateral lower extremities was ordered, and Plaintiff's Vicodin prescription was replaced with Norco. (AR 422, 425–26.)

Plaintiff received an injection in her right sacroiliac joint on November 10, 2015. (AR 421.) She reported pre-operative pain at a "8/10" and post-procedure pain at a "0/10". (AR 421.)

**B.     Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on June 21, 2013, and again on reconsideration on February 20, 2014. (AR 121–25, 127–32.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 134–41.) At the hearing on December 8, 2015, Plaintiff appeared with counsel and testified before an ALJ as to her alleged disabling conditions. (AR 36–37, 60–72.)

**1.     Plaintiff's Testimony**

Plaintiff testified that she has "constant" lower back pain that radiates down to her feet. (AR 60.) She stated she could sit for about 20 minutes and stand for about 15 minutes. (AR 60–61.) Plaintiff testified that for balance she uses a cane that was prescribed by outpatient physical therapy. (AR 62–63.) She can walk only 20 steps with the cane before having to stop. (AR 63.) In order to relieve her back pain, Plaintiff testified she lies down frequently, uses ice packs, and takes hot baths. (AR 63.) She also takes medication, which helps the pain, but causes drowsiness. (AR 63–64.) According to Plaintiff, she lies down about six hours day. (AR 64.)

Plaintiff also complains of chronic pain in her right knee, despite having had it surgically replaced. (AR 60, 64.) Plaintiff testified that the right knee replacement surgery neither helped the pain nor changed the nature of the pain: "[i]t feels the same or even more painful that before my knee replacement." (AR 64.) The pain medication she takes for her back helps her right knee pain "[v]ery minimal[ly]," and that cold and wet weather cause pain with movement. (AR 65.) She testified that she is "scared" to walk on uneven surfaces like grass or gravel. (AR 65.) According

to Plaintiff, she also suffers from chronic vomiting and diarrhea and frequent urination. (AR 60.)

Plaintiff lives in an apartment with her 18-year-old son. (AR 71–72, 80.) According to Plaintiff, she does not keep up with personal hygiene because it is difficult getting in and out of the bathtub. (AR 69.) She drives a car once or twice a week. (AR 70.) She drives to the grocery and attends church. (AR 70.) Plaintiff testified that she last worked as a care provider for approximately four months beginning in August 2014, but that she stopped working because she had "too much pain" in her right knee and was "very sick." (AR 36–37.)

### 2. Medical Expert's Testimony

Bruce J. Biller, M.D., board certified in internal medicine with a sub-specialty in endocrinology, testified at the hearing as a medical expert. (AR 34.) Dr. Biller found that Plaintiff's GERD, hypertension, and diabetes were controlled by medication. (AR 43–44.) He noted that Plaintiff had "done very well" following her total knee replacement, in that she had "progressed well with decreased pain and increased range of motion." (AR 49.)

Dr. Biller failed to find convincing evidence that Plaintiff met or equaled on the applicable listed impairment(s) in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") for her total knee replacement and noted that the result of that surgery "appeared . . . quite satisfactory." (AR 49.) He testified that there was no medical necessity for a cane or a knee brace. (AR 49–50.) With respect to Plaintiff's low back, although Dr. Biller noted there was evidence in the record of mild disc disease, there was no evidence of Plaintiff having been referred for physical therapy, occupational therapy, or a work hardening program. (AR 50.) Dr. Biller testified that, considering Plaintiff's back pain and knee pain, her activities of daily living "appeared consistent with someone who would be able to work, at the very least, in a sedentary job." (AR 50.)

Dr. Biller opined that Plaintiff retained the RFC to lift 20 pounds without difficulty and to stand and/or walk for six hours in an eight-hour day, with normal breaks. (AR 53.) Dr. Biller testified that Plaintiff should not kneel, crouch, or crawl due to her history of knee surgery and back pain. (AR 54.)

Plaintiff's counsel asked Dr. Biller whether he took into consideration the assessment of chronic pain in Plaintiff's right knee post-surgery, noting that Plaintiff's examinations at LAGS

Spine & Sportscare in September and October 2015 showed she had an abnormal gait and chronic pain. (AR 57–59.) Dr. Biller responded that the treating notes did not explain what "abnormal" meant and that Plaintiff's surgeon wrote during the same time period "information that would lead one to believe that she was making very good progress." (AR 58.) Dr. Biller responded further that Plaintiff had a "pain management issue" being attended to during that time period, resulting in Plaintiff being switched in November 2015 to Norco from Vicodin, a "more powerful drug." (AR 58.)

### 3.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as a home attendant, Dictionary of Operational Titles (DOT) code 354.377-014, which was medium exertional work with a specific vocational preparation (SVP)[6] of 3, and as a janitorial worker, DOT code 381.687-018, which was medium exertional work with a SVP of 2. (AR 75–76.) The ALJ asked the VE to consider a person of Plaintiff's age, education, and with her work background. (AR 76.) The VE was also to assume this person had the following limitations: lifting and carrying 50 pounds occasionally and 25 pounds frequently; sitting, standing and/or walking for six to eight hours in an eight-hour workday; climbing occasionally; never kneeling, crouching, or crawling; limited understanding and memory; moderately limited ability to understand, remember, and/or carry out detailed instructions and to interact with the general public; and mildly limited ability to accept instructions and respond appropriately to criticisms from supervisors. (AR 77–78.) The VE testified that such a person could perform Plaintiff's past relevant work. (AR 78.)

Plaintiff's attorney asked the VE, in a second hypothetical, whether an individual in the first hypothetical who would also need an additional unscheduled break of approximately one hour could perform Plaintiff's past work or any work in the national economy. (AR 78.) The VE testified that that there would be no work that such individual could perform. (AR 78.) Plaintiff's counsel posed a third hypothetical to VE of the same individual as in the prior hypotheticals with the additional

---

[6] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id.*

limitation of marked level of functioning in her ability to interact appropriately with co-workers, supervisors, and the public. (AR 78–79.) The VE testified that the world of work would be closed for that individual. (AR 79.) Plaintiff's counsel then posed a fourth hypothetical, adding the limitation of marked level of functioning in the hypothetical individual's ability to maintain attention and concentration as well as persistence and pace. (AR 79.) The VE testified that there would be no work that such individual could perform. (AR 79.) Lastly, Plaintiff's attorney posed a fifth hypothetical to the VE involving an individual with the same limitations as that presented in the first hypothetical, but with the additional need to use a cane to ambulate as well as to stand for prolonged periods. (AR 79–80.) According to the VE, such limitation would require that he consider new work only at the sedentary level, as a person with a cane in their hand is "limited to do less than what would be normal appropriate manipulation in order to do a job." (AR 79.)

## C.  The ALJ's Decision

In a decision dated January 22, 2016, the ALJ found that Plaintiff was not disabled, as defined by the Act. (AR 12–25.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520. (AR 14–24.) The ALJ decided that Plaintiff had not engaged in substantial gainful activity since August 11, 2012, the alleged onset date (Step One).[7] (AR 14.) At Step Two, the ALJ found Plaintiff's following impairments to be severe: degenerative joint disease of the knee, degenerative joint disease of the lumbar spine, diabetes mellitus, gastroesophageal reflux disease, obesity, hypertension, anxiety disorder, and post-traumatic stress disorder. (AR 14–17.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the Listings (Step Three). (AR 17–19.)

The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at Steps Four and Five. *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined that Plaintiff retained the RFC:

---

[7] The ALJ found that Plaintiff's work activity in 2013 and 2014 did not rise to the level of substantial gainful activity. (AR 14 (citing 20 C.F.R. § 404.1571(b)).)

> to perform medium work as defined in 20 CFR [§] 404.1567(c) except lift
> 25 pounds frequently and 50 pounds occasionally. She can sit, stand, and
> walk for 6 hours in an 8-hour workday. She can occasionally climb stairs
> and ramps. She should not kneel, crouch, or crawl. She can balance and
> stoop with no limitations. She has no manipulative, visual, communicative
> or environmental limitations. She is moderately limited in her ability to
> interact appropriately with the general public.

(AR 19.) Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" she rejected Plaintiff's subjective testimony as "not entirely credible." (AR 20.) The ALJ found that, on the basis of the RFC assessment, Plaintiff retained the capacity to perform her past work as a home attendance and a janitorial worker. (Step Four). (AR 24.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on April 17, 2017. (AR 1–8.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981.

## III.    LEGAL STANDARD

### A.    Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility [for disability benefits], the Commissioner" is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." *Id.* § 423(d)(2)(B). For purposes of this determination, "a 'physical or mental impairment' is an impairment that results from anatomical, physiological, or

psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The Ninth Circuit provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 404.1520(a)(4) (providing the "five-step sequential evaluation process"). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue her past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.    Scope of Review**

"This court may set aside the Commissioner's denial of disability insurance benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence is defined as being more than a mere scintilla, but less than a preponderance." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098). "Put another way, substantial

evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at 1156 ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV.     DISCUSSION

Plaintiff contends that the ALJ erred in assessing the opinions of the non-examining medical sources and in evaluating Plaintiff's credibility. (*See* Doc. 13 at 20–25; Doc. 15 at 2–5.) Defendant counters that the ALJ properly evaluated the medical opinion evidence and that substantial evidence supports the ALJ's rejection of Plaintiff's subjective complaints. (*See* Doc. 14 at 5–10.)

///

///

**A.**     **The ALJ Properly Assessed the Medical Opinion Evidence.**

**1.     Legal Standard**

There are three types of physicians: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant [but who review the claimant's file] (nonexamining [or reviewing] physicians)." *Holohan v. Massanari*, 246 F.3d 1195, 1201–02 (9th Cir. 2001) (citations omitted).   Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's.  *Id.*  If a treating or examining physician's opinion is uncontradicted, the ALJ may reject it only by offering "clear and convincing reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).  Conversely, "[i]f a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence."  *Id.* (citing *Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995)).  "However, the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory and inadequately supported by clinical findings."  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (quotation and citation omitted).  The opinion of a non-examining professional, by itself, is insufficient to reject the opinion of a treating or examining professional.  *Lester*, 81 F.3d at 831.

**2.     Medical Expert Dr. Biller**

The ALJ accorded "great weight" to the opinion of non-examining medical expert Dr. Biller, finding it was reliable because he had the benefit of reviewing the entire record, was board certified in internal medicine since 1976, and had 37 years of experience testifying in Social Security cases. (AR 22.)

Plaintiff contends that Dr. Biller's opinion was flawed because he failed to consider evidence of Plaintiff's osteoarthritis of her right knee or her treating orthopedist Dr. Lester's "assessment that the result of the total knee replacement was unsatisfactory."  (Doc. 13 at 20; Doc. 15 at 2–3.)  In particular, Plaintiff contends that Dr. Biller's testimony shows that he did not consider her May 2013 MRI results showing "[m]ild changes of osteoarthritis in the right knee joint"; her receipt of

hyaluronic acid injections beginning in January 2014; Dr. Lester's January 19, 2015, treatment note stating that Plaintiff has "progressive arthritis" in her right knee as a well as a new medial meniscus tear and that another arthroscopic surgical procedure would "only remove the torn cartilage" but "not [] the advanced arthritis"; Dr. Lester's March 3, 2015, treatment note stating Plaintiff has "significant arthritis" and indicating he had "discussed with [Plaintiff] the risks, benefits, and alternatives of surgery including clots, pain, infection, and failure as well as the fact that 20% of all people are unsatisfied with the surgical result"; and Dr. Lester's August 10, 2015, treatment note, written five months following knee replacement surgery, stating Plaintiff's scar was "a bit erythematous suggesting internal inflammation as well as external" and that "[o]ne out of five knees is like [Plaintiff's].  It is not the fault of [Plaintiff] or anyone else." (*See* Doc. 13 at 20, 21 (citing AR 295, 328, 355, 361, 369).  *See also* Doc. 15 at 3.)

However, Dr. Biller's testimony reveals that he had, in fact, considered Dr. Lester's January 19, 2015, pre-surgery treatment note suggesting a re-tear of the medial meniscus and swelling in her right knee, as well as Dr. Lester's August 10, 2015, post-surgery treatment record, which indicated that Plaintiff was still having pain in her right knee and using narcotic medication to address that pain. (*See* AR 45, 46, 58, 59.)  Dr. Biller opined that Plaintiff should not kneel, crouch, or crawl due to her history of knee surgery, but determined that "even taking into account the . . . knee pain might be occurring in [Plaintiff]," Plaintiff's activities of daily living "appeared consistent with someone who would be able to work, at the very least, in a sedentary job." (AR 50, 54.)

Plaintiff seems to suggest that the ALJ should have afforded greater weight to evidence of arthritis in her knee that predated her total knee replacement, while giving lesser weight to the medical expert's assessment of the overall record and clinical findings showing that, following her surgery, Plaintiff had "done very well."[8] (AR 49.)  However, it is the role of the Commissioner, not this Court, to resolve conflicts in evidence.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *Richardson*, 402 U.S. at 400.  If the evidence supports more than one rational interpretation,

---

[8] In her reply brief, Plaintiff cites treatment records from LAGS Spine & Sportscare that she contends the ALJ did not address, suggesting such failure was in error. (*See* Doc. 15 at 3 (citing AR 427–29, 431–32, 434).)  Contrary to Plaintiff's assertion, however, the ALJ *did* address these records: she accorded them "light weight" because they did "not contain any objective findings to support their conclusions except for range of motion tests" and contained "several inconsistencies" (AR 23)—a finding that Plaintiff does not challenge in this appeal.

this Court may not substitute its judgment for that of the Commissioner. *See Burch*, 400 F.3d at 679 ("[W]here evidence is susceptible to more than one rational interpretation, it is the [ALJ's] conclusion that must be upheld."). If there is substantial evidence to support the administrative findings, or if there is conflicting evidence that will support a finding of either disability or nondisability, the Commissioner's finding is conclusive. *Sprague v. Bowen*, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

Here, the record contains substantial evidence consistent with Dr. Biller's assessment that the result of Plaintiff's surgery "appeared . . . quite satisfactory," in that she had "progressed well with decreased pain and increased range of motion" in her right knee. (AR 49.) On March 23, 2015, following her knee replacement surgery on March 9, 2015, Plaintiff reported "feeling good" with a range of motion of 0 degrees to 90 degrees. (AR 358.) As Dr. Biller noted during the hearing, Dr. Lester saw Plaintiff on May 12, 2015, and reported she "could not be doing better" and that her range of motion was "excellent." (AR 45–46, 357.) Plaintiff was using a cane but, according to Dr. Lester, did not need it. (AR 46, 357.) Dr. Lester concluded that Plaintiff was "very happy with the results and the resolution of her pain." (AR 45–46, 357.) Upon discharge from physical therapy on May 18, 2015, Plaintiff had mild tenderness at the medial knee joint, moderate edema, and no longer used an assistive device. (AR 458.) Dr. Biller testified regarding the physical therapist's observation Plaintiff had "progressed well in therapy with decreased pain and increased [range of motion] and strength." (AR 49, 459.) The physical therapist noted further Plaintiff "still lacks full extension and flexion of her knee, but feels she can do her home exercise program to progress to full [range of motion]." (AR 459.) Dr. Biller observed during the hearing that, in June 2015, Plaintiff was still walking with a cane for long walks but was "otherwise doing fine." (AR 52, 53, 356.) Dr. Lester reported that Plaintiff was "very happy that she has no pain." (AR 52, 53, 356.) As Dr. Biller noted in his testimony, even though Plaintiff reported still having pain and using narcotics in August 2015, her x-ray examination was normal. (AR 46, 355.)

While an ALJ generally gives more weight to a treating doctor's opinion than to a non-treating doctor's opinion, a non-treating doctor's opinion may nonetheless constitute substantial evidence if it is consistent with other independent evidence in the record. *Thomas v. Barnhart*, 278

F.3d 947, 957 (9th Cir. 2002) ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record."); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (A non-examining medical expert's opinion "may constitute substantial evidence when it is consistent with other independent evidence in the record."); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir.1999) ("Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it" (citing *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995)); *see* 20 C.F.R. § 404.1527(c)(4) (ALJ will generally give more weight to opinions that are "more consistent . . . with the record as a whole"). The ALJ noted (AR 22), and Plaintiff agrees (Doc. 13 at 22), that Dr. Biller reviewed all of the medical evidence before rendering his opinion. *See* 20 C.F.R. § 404.1527(c)(3) (in weighing medical opinions, ALJ "will evaluate the degree to which these opinions consider all of the pertinent evidence in [claimant's] claim, including opinions of treating and other examining sources"). Moreover, the ALJ could credit Dr. Biller's opinion because he testified at the hearing and was subject to cross-examination.[9]  *See Andrews*, 53 F.3d at 1042 (greater weight may be given to nonexamining doctors who are subject to cross-examination). Based on the foregoing, and despite evidence cited by Plaintiff that could be considered more favorable to her, the Court finds Dr. Biller's opinion that Plaintiff did not meet or equal any applicable Listing for her total knee replacement and that she retained the RFC to lift 20 pounds without difficulty and to stand and/or walk for six hours in an eight-hour day, with normal breaks, but should not kneel, crouch, or crawl, is supported by the overall record.[10]  *See Burch*, 400 at 679. Accordingly, the ALJ did not err in

---

[9] Indeed, Plaintiff's counsel had the opportunity at the hearing to cross-examine Dr. Biller regarding the records showing Plaintiff's right knee arthritis (as she did with other evidence in the medical record, *see* AR 57–59), but did not do so.

[10] Plaintiff's contention that the ALJ failed in her duty to develop the record is equally without merit. (*See* Doc. 13 at 22.)  The ALJ's "duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir.2001); *see also Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005). Here, Plaintiff alleges that the medical record before the ALJ "was not fully developed" because Dr. Biller did not address "probative evidence" before rendering his opinion, but, as set forth above, Dr. Biller did consider that evidence. Moreover, neither the ALJ nor Dr. Biller found the record to be ambiguous or insufficient for proper evaluation. Instead, the ALJ found that Dr. Biller's opinion, which was rendered after reviewing the entire medical record and in view of his expertise and experience, allowed for a proper evaluation of Plaintiff's functional capacity. Because the existing evidence is neither ambiguous nor insufficient, the ALJ's duty to more fully develop the record was not triggered.

assigning "great weight" to Dr. Biller's opinion.

### 3. State Agency Physicians Drs. Lockie and Mitchell

The ALJ also gave "great weight" to the opinions of non-examining Disability Determinations Service medical consultants Drs. Lockie and Mitchell, finding them consistent with the medical record, except that Plaintiff's obesity and right knee pain caused greater limitations with respect to Plaintiff's ability to kneel, crouch, and crawl.  (AR 21.)  Plaintiff contends that the ALJ improperly credited Dr. Lockie's and Dr. Mitchell's opinions because they assessed her in May 2013 and February 2014, respectively, and their opinions did not account for medical records extending through August of 2015 (the same medical records that allegedly were not considered by Dr. Biller).  (*See* Doc. 13 at 21; Doc. 15 at 3.)  The Court disagrees.

As with Dr. Biller, Plaintiff relies upon a recitation of the subsequent records but fails to articulate how any particular medical record specifically undermines the opinions of Drs. Lockie and Mitchell, as credited by the ALJ.  That other medical evidence was produced after the date of the physicians' opinions does not alone render them stale.  Instead, the ALJ must evaluate their consistency with the entire record, including any evidence produced after the physicians' opinions were issued.  *See* Social Security Ruling ("SSR") 96-6p, 1996 WL 374188, at *2.  The ALJ did not err by giving Dr. Lockie's and Mitchell's opinions significant weight simply because evidence was produced after their opinions were issued.  *See Romanyuk v. Berryhill*, NO. C17-0030RSL, 2017 WL 3424965, at *5 (W.D. Wash. Aug. 9, 2017).

Moreover, it is unclear as to what functional limitations Plaintiff believes those subsequent records endorse that were not included in her RFC, as the ALJ expressly rejected Dr. Mitchell's kneeling, crouching, and crawling limitations in favor of a *more limiting* RFC with respect to those activities, taking into account the more recent evidence of Plaintiff's right knee pain.  (*See* AR 21 ("[T]he undersigned finds the kneeling, crouching, and crawling limitations opined were not considered in light of [Plaintiff's] obesity and right knee pain.  The undersigned finds these limits set forth in the [RFC] are consistent with the medical record and medical expert Dr. Biller's testimony, discussed in detail below.  [Plaintiff's] weight, combined with history of her right knee replacement, will cause some limitations.").  *See also* AR 19.)  The ALJ determined that both

doctors had an opportunity to examine the record and, after reviewing the record herself, determined that their opinions, except for the kneeling, crouching, and crawling limitations that she rejected, were consistent with the record as a whole. (*See* AR 21 (citing AR 320, 357).) Plaintiff does not establish harmful error in that finding. *See Thomas*, 278 F .3d at 957; *Lester*, 81 F.3d at 830-31. As with Dr. Biller, Plaintiff's contentions, at most, amount to a request for the Court to accept her interpretation of the evidence over that of the ALJ but fail to demonstrate that the ALJ's interpretation is unsupported by substantial evidence. *See Ludwig v. Astrue*, 681 F.3d 1047, 1054 (9th Cir. 2012) (burden is on the party claiming error to demonstrate the error); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (Court must uphold the ALJ's determination if it is reasonable and supported by substantial evidence even if there are reasonable alternative interpretations).

### 4. Consultative Examiner Dr. Sachdeva

Lastly, Plaintiff appears to suggest that the rejection of consultative examiner Dr. Sachdeva's opinion was not for specific and legitimate reasons because it was discounted in favor of the opinions of Drs. Biller, Lockie, and Mitchell, citing *Lester*, 81 F.3d at 831. (*See* Doc. 13 at 21.) While Plaintiff is correct that the opinions of the non-examining medical sources cannot by themselves constitute substantial evidence that justifies rejection of Dr. Sachdeva's opinion, such is not the case here. The ALJ did not use Drs. Biller's, Lockie's, or Mitchell's opinions to assign "little weight" to Dr. Sachdeva's opinion; instead, the opinion was rejected because Dr. Sachdeva's examination took place prior to Plaintiff's knee replacement surgery and contained limitations based on injuries that had resolved because of the surgery. (AR 22.) Thus, Dr. Sachdeva's opinion "did not account for [Plaintiff's] entire medical condition since the alleged onset date." (AR 22.) The ALJ further rejected Dr. Sachdeva's opinion because it was not supported by the objective findings in his examination of Plaintiff. (AR 22.)

An ALJ may properly discount an examining physician's opinion that is not supported by the medical record, including his own findings. *See Valentine*, 574 F.3d at 692–93 (contradiction between physician's opinion and his treatment notes constitutes specific and legitimate reason for rejecting opinion); *Bayliss*, 427 F.3d at 1216 (same); *Batson v. Comm'r of Social Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004); *Thomas*, 278 F.3d at 957; *Johnson v. Shalala*, 60 F.3d 1428, 1433

(9th Cir. 1995) (ALJ properly rejected medical opinion where doctor's opinion was contradicted by his own contemporaneous findings); *Khounesavatdy v. Astrue*, 549 F. Supp. 2d 1218, 1229 (E.D. Cal. 2008) ("[I]t is established that it is appropriate for an ALJ to consider the absence of supporting findings, and the inconsistency of conclusions with the physician's own findings, in rejecting a physician's opinion."). Here, although Dr. Sachdeva opined that Plaintiff was limited to standing and/or walking for four hours in an eight-hour work day, lifting and carrying 20 pounds occasionally and 10 pounds frequently, and performing occasional postural activities, the ALJ noted that Dr. Sachdeva found during his examination of Plaintiff that she had full range of motion in extremities and normal strength. (AR 22, 319–20.)

The ALJ further noted that the record contains evidence that Plaintiff's knee condition improved after her knee replacement surgery on March 9, 2015, which postdates Dr. Sachdeva's examination. (AR 22.) Two weeks following surgery, Plaintiff reported to treating orthopedist Dr. Lester that she was "feeling good" with "some soreness" but "no complaints." (AR 17, 358.) She was deemed to be "doing well" and was to continue physical therapy. (AR 17, 358.) As the ALJ observed, Dr. Lester reported in May 2015 that Plaintiff could "could not be doing better" and that her range of motion was "excellent." (AR 17, 357.) Following discharge from physical therapy that same month, Plaintiff's physical therapist observed that Plaintiff "has progressed well in therapy with decreased pain and increased [range of motion] and strength." (AR 459.) In June 2015, Dr. Lester noted that Plaintiff is "doing fine" and that Plaintiff was "very happy that she has no pain." (AR 17, 356.) Plaintiff's right knee x-ray in August 2015 showed normal results. (AR 17, 355.) The ALJ's observation, based on the objective medical evidence, of Plaintiff's improvement after knee replacement surgery is yet another a specific and legitimate reason for rejecting Dr. Sachdeva's opinion. *See Nino v. Colvin*, No. 1:13–CV–832 GSA, 2015 WL 3756889, at *5 (E.D. Cal. June 16, 2015) ("District courts have held that an ALJ's conclusion, supported by substantial evidence in the record, that a claimant's symptoms improved and stabilized with treatment counts as a specific and legitimate reason to discount a doctor's opinion."). *See also Palma v. Colvin*, No. 2:15-cv-1736-EFB, 2016 WL 8730663, at *6 (E.D. Cal. Sept. 30, 2016).

In sum, the Court finds, contrary to Plaintiff's contention, that the ALJ provided specific,

legitimate reasons supported by substantial evidence for discounting Dr. Sachdeva's opinion on grounds that the opinion was not supported by the objective medical evidence, including his own findings and by evidence of Plaintiff's improvement post-surgery.

**B.      The ALJ Properly Found Plaintiff Less Than Fully Credible.**

      **1.      Legal Standard**

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Id.* As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray*, 554 F.3d at 1226–27. Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

The clear and convincing standard is "not an easy requirement to meet," as it is "'the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Social Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). General findings are not sufficient to satisfy this standard; the ALJ "'must identify what testimony is not

credible and what evidence undermines the claimant's complaints.'" *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester*, 81 F.3d at 834).

## 2. Analysis

The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR 20.) The ALJ also found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (AR 20.) Since the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the only remaining issue is whether the ALJ provided "specific, clear and convincing reasons" for Plaintiff's adverse credibility finding. *See Vasquez*, 572 F.3d at 591. Here, the ALJ found Plaintiff's credibility was undermined by several factors: the fact that she worked after her alleged onset date; inconsistent statements made to her physicians; and the objective medical evidence. (AR 43–45.) The Court takes each finding in turn.

### a. Work History

The ALJ discounted Plaintiff's credibility because the record reflected she "worked after her alleged onset date," which "showed she was more able-bodied than alleged." (AR 21.) Plaintiff, relying on *Lingenfelter*, argues that Plaintiff's "sporadic attempt to work in 2013 and 2014" is not a convincing reason to reject her testimony regarding her symptoms and limitations. (Doc. 13 at 24; Doc. 15 at 4–5.) But *Lingenfelter* is factually distinguishable. In that case, the Ninth Circuit stated that the mere "fact that a claimant tried to work for a short period of time and, because of [her] impairments, *failed*," does not mean "that [s]he did not then experience pain and limitations severe enough to preclude [her] from *maintaining* substantial gainful employment." 504 F. 3d. at 1038 (emphasis in original).

In *Lingenfelter*, the claimant was fired from a job he had performed for a period of nine weeks after his date last insured, "because he was too slow to do the work adequately." *Id.* at 1033. The claimant also testified that "when he returned home from work each day his 'feet were so swollen,' and that he 'just couldn't do it anymore' because of the pain." *Id.* Here, while Plaintiff testified that she stopped working in 2014 because she had "too much pain" in her right knee and

was "very sick" (AR 36–37), there is no evidence in the record that Plaintiff was forced to cease working in 2014 due to her impairments and limitations. In 2013, Plaintiff earned $11,970.63—just $509.37 less than the required earning for substantial gainful activity.[11] (AR 14, 182.) *See Lombardi v. Comm'r of Soc. Sec.*, No. 2:15-cv-0478-KJN, 2016 WL 1375565, at *4 (E.D. Cal. Apr. 7, 2016) (distinguishing *Lingenfelter* because, unlike Lingenfelter, the plaintiff in that case "did not fail to find or sustain work because of her impairments"). *See also Denham v. Astrue*, 494 F. App'x 813, 815 (9th Cir. 2012) (affirming a credibility finding that relied, in part, on two years of part-time janitorial work after the alleged onset date). In addition, Plaintiff thereafter sought, and obtained, work with a different employer in 2014. An ALJ may consider a plaintiff's continued search for employment after the alleged onset date in weighing plaintiff's credibility. *See Bray*, 554 F.3d at 1227 (upholding an adverse credibility finding that relied in part on the plaintiff's work history and subsequent seeking out of employment).

The Ninth Circuit in *Lingenfelter* also expressly noted that the claimant's "failed work attempt did not even take place during the relevant time period"—*i.e.*, the period between his alleged onset date of disability and his date last insured. 504 F.3d at 1039 (noting claimant had burden to prove he was disabled for at least twelve-month period during that time). Here, there is no dispute that the work activity at issue in this case occurred within the relevant time period in this matter. (*See* AR 12, 182, 186, 227, 234.)

On balance, the ALJ's negative credibility determination based in part on Plaintiff's ability to work after her alleged disability onset date is not an irrational interpretation of the facts and is therefore a valid reason to discount Plaintiff's credibility. While Plaintiff's work record could be found to corroborate her disability rather than indicate an ability to work contrary to her testimony, because the evidence can support either outcome, and in light of the deference that must be given to the ALJ's decision, the Court cannot substitute its judgment for that of the ALJ. *Andrews*, 53 F.3d at 1039–40.

///

---

[11] In fact, the record contains evidence that Plaintiff earned in excess of the substantial gainful activity level for 2013. (*See* AR 182, 184, 188 (showing $14,738.13 in earnings for 2013).)

### b. Inconsistent Statements

An ALJ may discredit a claimant where her testimony is "inconsistent with her statements to her doctors." *Terrazas v. Comm'r Soc. Sec. Admin.*, 500 F. App'x 628, 630 (9th Cir. 2012); *see also Thomas*, 278 F.3d at 959 (affirming credibility determination where ALJ partly discredited the plaintiff because she made inconsistent statements to her doctors). Here, the record supports the ALJ's finding that Plaintiff's allegation of chronic pain in her right knee conflicts with her statements to Dr. Lester. As the ALJ noted, Plaintiff testified at the hearing that her right knee replacement surgery neither helped nor changed the nature of her pain, yet two weeks after her surgery she reported to Dr. Lester that she was "feeling good" with "some soreness" but "no complaints." (AR 21, 64, 358.) The ALJ further noted that although Plaintiff presented to LAGS Spine & Sportscare on April 30, 2015, complaining of knee pain, she reported to Dr. Lester less than two weeks later, on May 12, 2015, that she was "very happy with the results and the resolution of her pain." (AR 21, 357, 447.) Plaintiff again reported to Dr. Lester on June 2, 2015, that she was "very happy that she has no pain." (AR 21, 356.)

Plaintiff's contention that that the ALJ's finding of inconsistency was "cursory" and lacking "further corroboration or explanation" is not persuasive. (Doc. 13 at 25.) The ALJ identified the specific statements and testimony she found not credible and explained why. Because the ALJ identified inconsistencies within Plaintiff's statements, the ALJ cited specific, clear and convincing reasons to support her adverse credibility finding on this basis. [12] Although Plaintiff disputes the ALJ's interpretation of medical record, and while the record could arguably support Plaintiff's position, the Court must defer to the ALJ's determination where, as here, the determination is a reasonable one. *See Batson*, 359 F.3d at 1198. The Court therefore concludes that the ALJ permissibly discredited statements based on inconsistencies between Plaintiff's complaints of

---

[12] In addition to the inconsistent statements described above, the ALJ also cited to medical records indicating that Plaintiff could not recall the birthdays of her two children during her examination by Dr. Michiel. (AR 21, 348.) The ALJ noted that at the hearing, however, Plaintiff testified that her son turned 18 years old on September 17. (AR 21, 71.) This is does not appear so much an inconsistency as a one-time failure to remember a certain date at a certain point in time. Although the ALJ incorrectly characterized this as an inconsistency, such error was harmless due to Plaintiff's other inconsistent statements that the ALJ properly considered in making the credibility determination. *See Tonapetyan*, 242 F.3d at 1148 (that some reasons for discrediting claimant's testimony should be properly discounted does not render ALJ's determination invalid so long as that determination is supported by substantial evidence).

disabling symptoms and her statements to her treating physician.

### c. Objective Medical Evidence

Plaintiff's remaining argument is that the ALJ's stated rationale relating to the objective medical evidence is not a valid clear and convincing reason for the adverse credibility finding. (*See* Doc. 13 at 23–24; Doc. 15 at 3–5.) The Court disagrees.

"[T]he Ninth Circuit has repeatedly emphasized that, 'in evaluating the credibility of pain testimony after a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints based *solely* on a lack of medical evidence to fully corroborate the alleged severity of pain.'" *Ondracek v. Comm'r of Soc. Sec.*, Case No. 1:15–cv–01308–SKO, 2017 WL 714374, at *8 (E.D. Cal. Feb. 22, 2017) (quoting *Burch*, 400 F.3d at 680); *see also, e.g., Rollins*, 261 F.3d at 857 ("[S]ubjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence . . . ."); SSR 96–7p, 1996 WL 374186 ("An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."). Nonetheless, "lack of medical evidence . . . is a factor that the ALJ can consider in his credibility analysis." *Burch*, 400 F.3d at 681. *See also Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir.2004); *Morgan*, 169 F.3d at 600. Stated differently, "[a]lthough the inconsistency of objective findings with subjective claims may not be the sole reason for rejecting subjective complaints of pain, it is one factor which may be considered with others." *Salas v. Colvin*, No. 1:13–cv–00429–BAM, 2014 WL 4186555, at *6 (E.D. Cal. Aug. 21, 2014) (citations omitted).

Here, Plaintiff testified that she has "constant" lower back pain that radiates down to her feet. (AR 60.) She stated she could sit for about 20 minutes, stand for about 15 minutes, and must lie down about six hours day. (AR 60–61, 64.) However, as the ALJ observed, consultative examiner Dr. Sachdeva made contrary findings. (AR 20.) He noted that Plaintiff had no tenderness to palpation in the midline or paraspinal areas of her back and her range of motion was normal. (AR 20, 319.) Plaintiff's range of motion in her cervical spine was also normal, and her straight leg raising tests in seated and supine positions were negative bilaterally. (AR 20, 319.)

As the ALJ observed, Plaintiff's most recent lumbar spine MRI showed "[m]inor degenerative changes of the lumbar spine with neural foraminal narrowing at several levels and nerve abutments at L5-S1" and "[m]ild disc bulges at T11-12, L4-5 and L5-S1 slightly indenting on the thecal sac without significant central canal stenosis." (AR 20, 419.) Plaintiff contends that the same MRI "revealed bilateral impingement of Plaintiff's nerve roots at the L5-S1 levels" (Doc. 13 at 23), but no such finding is contained in the objective testing results. (*See* AR 419.)

Plaintiff also testified that she suffers chronic pain in her right knee, despite having had it surgically replaced, and that the surgery in fact increased the pain. (AR 64.) The ALJ's finding that Plaintiff's claim is belied by the substantial evidence in the medical record: as set forth more fully above (*see* Section IV.A.2), Plaintiff reported "feeling good" in March 2015, two weeks after surgery; her orthopedic surgeon noted in May 2015 that Plaintiff "could not be doing better" and that she was "very happy with the results and the resolution of her pain"; and an August 2015 x-ray of her knee was normal, despite her complaints of pain. (AR 20, 355, 357–58.)

Lastly, Plaintiff testified that she suffers from "chronic" vomiting and diarrhea. (AR 60.) As the ALJ observed, the medical record shows, however, that Plaintiff denied vomiting and diarrhea in April 2015 and again in November 2015. (AR 21, 425, 449.) Plaintiff disputes the ALJ's finding that Plaintiff's "last bout of vomiting diarrhea occurred in August 2014" (AR 21), asserting that it is "contradict[ed]" by evidence in the record that Plaintiff reported "nausea" in April 2014 and "loose stools" in July 2015. (Doc. 13 at 24. *See* AR 373, 449.) But reports of "nausea" and "loose stools" are not the same as "vomiting" and "diarrhea," and in any event do not undermine the evidence in the medical record that Plaintiff denied vomiting and diarrhea after those reports, in November 2015.

In sum, while it is clear that Plaintiff disagrees with the ALJ's interpretation of the medical evidence, it is equally clear that it is not within the province of this Court to second-guess the ALJ's reasonable interpretation of the medical evidence, even if such evidence could give rise to inferences more favorable to Plaintiff. *See Rollins*, 261 F.3d at 857 (citing *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989)). The Court therefore finds that the ALJ offered clear and convincing reasons to discredit Plaintiff's testimony regarding the extent of her pain and limitations, noting

not only a lack of objective medical evidence to corroborate the extent of Plaintiff's asserted pain and limitation, but also Plaintiff's inconsistent statements as well as Plaintiff's work history that, taken as a whole, undercut Plaintiff's credibility. *See, e.g., Gonzalez v. Astrue*, No. 1:11–cv–01473–SKO, 2013 WL 394415, at *14 (E.D. Cal. Jan. 30, 2013).

## V.    CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:    **July 23, 2018**                              /s/ *Sheila K. Oberto*
                                                   UNITED STATES MAGISTRATE JUDGE